Herman Franck, Esq. (SBN. 123476)
Elizabeth Betowski, Esq. (SBN. 245772)
**FRANCK & ASSOCIATES**
910 Florin Road #212
Sacramento, California 95831
Telephone (916) 447-8400
Facsimile (916) 447-0720

Attorney for Plaintiffs Ryan Sylvester and Angela Ellis

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
[Sacramento Division]

| | |
|---|---|
| RYAN SYLVESTER; ANGELA ELLIS, | Case No. 2:20-cv-01797-TLN-CKD |
| Plaintiffs, | <u>SECOND</u> AMENDED COMPLAINT FOR |
| v. | 1. **VIOLATION OF THE FEDERAL CIVIL RIGHTS ACT, 42 U.S.C. SECTION 1983;** |
| SACRAMENTO COUNTY SHERIFF'S DEPARTMENT AND/OR COUNTY OF SACARMENTO; SHERIFF SCOTT JONES; TIMOTHY MULLIN; DICK MAH; BOBI GRIGGS, | 2. **VIOLATION OF CALIFORNIA'S UNRUH CIVIL RIGHTS ACT** |
| Defendants | **REQUEST FOR INJUNCTIVE RELIEF TO STOP WHITE COP KILLING BLACK MAN AND ENSUING COVER UP** |
| | **REQUEST FOR JURY TRIAL** |

Plaintiffs Ryan Sylvester and Angela Ellis allege, and state as follows:

Second Amended Complaint

1

# I.
## JURISDICTION AND VENUE

1. Jurisdiction in the Court's unlimited jurisdiction is based on this court's concurrent jurisdiction over cases brought under the Federal Civil Rights Act, 42 U.S.C. Section 1983, and on the fact that the amount in controversy in this wrongful death case is well in excess of $25,000.

2. Venue in Sacramento County is based on the fact that the violations of Federal Civil Rights complained of herein occurred in Sacramento County; and on the further basis that the defendant Sacramento County Sheriff's Department and Sacramento County have their headquarters in Sacramento County.

# II.
## PARTIES

3. Plaintiff RYAN SYLVESTER is the father of the deceased, Ryan Ellis, who was wrongfully killed by Sheriff's Deputies in the fields behind the cleaners off of Watt Ave, Sacramento, on May 4, 2017, and who has had to endure the ensuing coverup of the wrongful killing.

4. Plaintiff ANGELA ELLIS is the mother of the deceased, Ryan Ellis, who was wrongfully killed by Sacramento Sheriff's Deputies in the fields behind the cleaners off of Watt Ave, Sacramento, on May 4, 2017, and who has had to endure the ensuing coverup of the wrongful killing.

5. Defendant SACRAMENTO COUNTY SHERIFF DEPARTMENT is an agency of Sacramento County, and is further sued herein as Sacramento County. Defendant

Sacramento County Sheriff Department is a public entity. Defendant is sued in this matter for conduct under color of legal authority to engage in an official cover-up of what really happened to Ryan Ellis on May 4, 2017 in the field behind the cleaners on Watt Ave, Sacramento. The specifics of the cover-up are listed below. Defendant is sued in this matter based on its official custom, policy, and practice of covering up white on black police killings. This practice, as applied to plaintiffs' claims, is of a continuing nature, and applies to the present, as the Sheriff's Department is still cover-up this wrongful killing, and is expected to continue to do so in the future.

6.  Defendant SHERIFF SCOTT JONES is sued herein in his official capacity for the purpose of obtaining injunctive relief requiring the Sacramento County Sheriff Department to stop its custom, practice, and policy of covering up white on black sheriff's killings and refusal to provide basic documents including a sheriff's investigative report, and to instead obstruct justice and deprive plaintiffs of their civil rights to access to evidence to present a federal civil rights claim based on this wrongful killing, or such other injunctive relief as this court deems just and appropriate.

7.  Defendant TIMOTHY MULLIN was previously sued herein with the fictitious name of "et" and has now been become known to plaintiff as Timothy Mullin, who is sued herein in his individual and personal capacity for conduct committed personally by this deputy under color of legal authority as a uniformed Sacramento County Deputy Sheriff. Defendant Timothy Mullin is sued herein for committing the various acts of misconduct constituting a violation of plaintiff's federally-protected civil rights arising under the United States Constitution, and as specified below.

8.  Defendant DICK MAH was previously sued herein with the fictitious name of "et" and has now been become known to plaintiff as Dick Mah, who is sued herein in his individual and personal capacity for conduct committed personally by this deputy under color of legal authority as a uniformed Sacramento County Deputy Sheriff. Defendant Dick Mah is sued herein for committing the various acts of misconduct constituting a violation of plaintiff's federally-protected civil rights arising under the United States Constitution, and as specified below.

9.  Defendant BOBI GRIGGS was previously sued herein with the fictitious name of "al", and has now been become known to plaintiff as Bobi Griggs, who is sued herein in his/her individual and personal capacity for conduct committed personally by this deputy under color of legal authority as a uniformed Sacramento County Deputy Sheriff. Defendant Bobi Griggs is sued herein for committing the various acts of misconduct constituting a violation of plaintiff's federally protected civil rights arising under the United States Constitution, and as specified below.

10. Plaintiffs became aware of the true name and identify of defendants Mullin, Mah, and Griggs, on or about October 16, 2020, when the County of Sacramento and the Sacramento County Sheriff Department provided written responses to plaintiffs' initial discovery requests.

## III.
## NEW ALLEGATIONS IN LIGHT OF LAW ENFORCMENT REPORTS OBTAINED BY PLAINTIFFS

11. Plaintiffs have now recently learned through the production of these discovery responses the identity of the involved Sacramento County Sheriff's Department on the night of Ryan Ellis' death, as follows: Defendant Bobi Grigg was the deputy driving Ryan to the county jail. Defendant Mah and Mullin arrived at the scene following deputy Griggs calling in of the jumped out of the car incident. With these names now finally discovered for the first time, we amend the complaint to add them as defendants in each of the two claims for relief herein, First Claim for Relief for Violation of the Federal Civil Rights Act, 42 USC Section 1983, and Second Claim for Relief for violation of the California Unruh Civil Rights Act, Civil Code Section 51 et al.

12. Plaintiffs contest the accuracy of the Sheriff's Investigative Report, and do not by referencing them herein admit the truth of what was said therein. Instead the truth is that The Sheriff's Department, the DA, and the Sacramento County Inspector General all decided to disregard the observations and evidence that was available from the victim Ryan Ellis' family, and as stated in this complaint.

13. Plaintiffs received the Sheriff's Deputy Investigative Report on October 16, 2020, as part of the production of documents from the County's attorney. We have not attached the report here, as it includes quite a bit of confidential and private information. It also includes the following items:

14. The District Attorney's April 19, 2019 Memorandum of the death of Ryan Ellis concluding: "It cannot be said that Deputy Griggs acted in an aggravated, culpable, gross,

or reckless manner. She did not act with a disregard for human life or an indifference to the consequence of her actions. Therefore, her conduct on that evening does not constitute a criminal act under any theory of homicide."

15. It should be noted that in keeping with the general practices of law enforcement killing an arrested black man, at no time did the DA investigation or the Sacramento County's Inspector General ever reach out to the victim's family for any evidence they had about what happened that night. As a consequence, the entire version of events described below were never uncovered or reviewed by the DA or the County Inspector General. Instead the events of the night just accepted at true the statements of the involved three deputies, defendants Griggs, Mullin, and Mah.

16. Plaintiffs also received the Sheriff's Investigative Report, 141 pages.

17. The Report includes statements from Griggs, Mullin, and Mah about the arrest of Ryan Ellis.

18. Defendant Mullin stated [at Report, page 17-18]:

"I took control of ELLIS'S left arm, and Deputy Mah took control of ELLIS'S right arm. ELLIS immediately tensed up and began to resist. I took control of ELLIS. left arm and brought it to his side. When I felt ELLIS tense up I put ELLIS in a rear control hold lifting up his arm. By doing this, ELLIS bent over at the waist and leaned forward toward the car. While keeping control of ELLIS. left arm I removed my handcuffs and placed them on ELLIS. A search of ELLIS.s person for weapons was conducted with negative results. Deputy Mah and I escorted ELLIS to Deputy Griggs. patrol vehicle. During the

escort to the patrol vehicle, I maintained a control hold of ELLIS. left wrist as he was

acting passive resistive and not fully walking to the patrol car willingly. ELLIS would

stall at times and try to slow his walk to the patrol car."


19. Defendant Mah stated about his involvement at the scene of Ellis' arrest [Report, page 9]:

"Deputy Mullin directed the driver, who later identified himself as ELLIS, to show his

hands but was slow to comply. ELLIS slowly complied and he stepped out of his vehicle

where Deputy Mullin and I handcuffed ELLIS. I searched ELLIS right side body while

Deputy Mullin searched his left side. After searching his right side, I did not locate any

weapons or contraband."


20. The ASSIGNMENT/CALL OUT INVESTIGATION summary by Det. Viceroy, Report

Page 48-49 further describes how the arrest of Ryan Ellis occurred:

"Deputy Mullin # 765, 10C1, Vehicle 122-526: Deputy Mullin provided us information

regarding the original call. The text of the call indicated Ellis was on foot in the area with

other unknown males.


Deputy Mullin searched the area to the north of the dispatched location and was unable to

locate the suspect. He then contacted the complainant, Breanna Ellis, who told Deputy

Mullin a suspect was on Galbrath and he had updated this information via radio. B. Ellis

indicated R. Ellis was wearing a distinctive American flag t-shirt. Deputy Griggs voiced

she had located a blue mustang occupied by two subjects in the area. Dispatch updated

that R. Ellis was known to be armed with a handgun and had resisting arrest history.

Deputy Mullin contacted the driver of the Mustang, R. Ellis. Mullin indicated the

passenger was a female who was later identified as Clarenisha Moore X-4986272.

Deputy Mullin placed handcuffed R. Ellis and placed him in the rear seat of Deputy
Grigg's vehicle. Mullin indicated R. Ellis did not appear to be under the influence and
described his demeanor as agitated. As he was taken into custody, R. Ellis demanded to
speak with his parole agent before he was booked. Deputy Mullin also noted several
friends and family that came out of the house nearby and started yelling about excessive
use of force. Deputy Griggs went westbound on Elkhorn and Deputy Mullin left quickly
to respond to another priority in-progress call in the opposite direction. He later heard
Deputy Griggs voice updates that R. Ellis was kicking out her vehicle window, followed
shortly after by he was proned out at gunpoint. Deputy Mullin responded to assist Deputy
Griggs Code 3. When he arrived on scene he saw Ellis had blood on his face along with
abrasions on his face. He heard Ellis snoring loudly. Mullin blocked off the scene and
Fire personnel arrived and transported Ellis to Mercy San Juan. Deputy Mullin indicated
his in car camera system was on and that he knew that Deputy Griggs had an older
version of the in car camera system which required a manual switch from the front
camera to the rear seat facing camera. On their initial contact with Ellis and Moore he
claimed to be associated with 4209 Galbrath and stated he was with his girlfriend and
they were doing laundry. As they were taking him into custody Ellis demanded to speak
with Parole officers before being booked."

21. Defendant Griggs described how Ryan acted in her patrol car, complaining about the
handcuffs [Interview with Griggs, Report, page 61]:
"He's just like yelling back there and um, and like making a bunch of noise like you
know the clanking of the plastic, the cuffs hitting the plastic, just going crazy and I'm like
gosh. He's like you can't arrest me, this is harassment, he just kept saying we were
harassing him, you can't arrest me and then he started saying these, these mother fucking

cuffs are too tight, these cuffs are too tight, these cuffs are too tight he just kept saying

that and I said.........and he's like you better fucking fix these cuffs, these cuffs are too

tight. And I was like you're not gonna get anything from me if you talk to me like that, I,

I was just trying to calm him down. So in my head at that point I was like thinking I need

to pull over and freaking like re-evaluate this situation cause he's going crazy back there,

like he's moving all over the place and then I think like is why is he moving so much,

why is he so worried about the cuffs being so tight, like what does he have on him."

22. Deputy Griggs then described how Ryan Ellis jumped out of the patrol car [Report, page
    61-63, interview of Grigg]:

"Well split second he's laid down in the car boom, boom windows kicked out and I'm

like oh God dang it. So he's like I'm gonna jump out this mother fucker and I was like oh

my God. So I get on the radio and I'm all my in custody just kicked my window out and

says he's gonna jump out of my car and um, I said.......so then I you know let go of the

mic and then uh, he like......I actually didn't think he was gonna be able to stand up but

he was like trying to shimmy his way up and so I'm kinda trying to speed up and slow

down to like jerk it so that he would fall back in the car and um, then I get on the radio

and I'm telling them like I'm gonna continue driving so that he doesn't jump out of the

car cause I'm thinking to myself if I slow down to a safe speed he's out of the car and

then that means that I'm gonna have to stop the car, I'm gonna have to chase after him in

the dark, no partners anywhere because they're all on other calls, everybody's tied up

cause it's so busy and so I'm like........so I get on the radio and I tell everybody I'm , I'm

gonna continue until someone catches up to me. So then, then, then the next like radio

traffic is like basically me just calling out a stop. Oh, at one point um, uh, at one point I

did hear someone, and I don't know who it was, I know now, but I don't know who it

was at the time say have her turn on her lights so that I can see where she's at and I was like duh, I need to turn my lights on so I turn my lights on and um......well when you turn your lights on with no siren all the cars start freaking out in front of me so I was like okay well I'm gonna......I, I'm not really driving code but I'm like trying to like figure this out so my lights are on but no siren and then cars are starting to like act crazy and I like start to pull up to the intersection of Watt so I'm like doing the wail and I'm you know trying to slow everybody down so like I can clear the intersection, I'm trying to drive slow and clear the intersection and I'm, but I'm still trying to maintain like just a little bit of speed so he doesn't just hop right out of my car cause he is halfway out the whole time. His lower half is in the car, his upper half is completely out of the car facing out the whole time, from the minute he kicked my window out. So I get on Watt and he starts to shimmy up higher and I'm like crap. So um, at one point I'm like again trying to not hit anybody so I'm driving fast, driving slow and then I'm like trying to get over and make people are getting um, out of my way and um, I take a quick peek back and when I peeked back he had one foot on the window sill and his other foot on the plastic seat so he had made himself all the way up and faced in and it looked like he was leaning into the top of the car so I was like.......I was like he's climbing.......I got on the radio and I said he's climbing on top of my car. Well then at that split second that's I'm saying that he jumps, so I stopped the car........I had started to slow down when he was, when I took that peek back, I started to slow down, like he's climbing on top of my car because I know I was like well he's out, like he's out. I'm not gonna drive around with him on the hood or on the top of my car. So I um, start to slow down and at that point he jumped and so then I stopped, slammed my brakes on and stopped and I jumped out of my car, ran around the back of my car and I was looking outward expecting him to be running and um, when I looked, I went out like this and I looked down and he was right there like

right, right behind my car. And um, uh, so I said I have him.......I got on the radio and I said I have him at gunpoint and then I said uh, I said um, I have him proned so that everybody weren't.......they weren't looking for him up or walking around or whatever and um, that's when Mullin and Mah arrived on scene and they came over while I had him at gunpoint they came over and they like grabbed him and I think that's when Mullin like realized like he was bleeding and so he called for Code 3 fire. So um, we were like sitting there for a little bit and I said.......I don't even know how long I mean a little bit feels like forever. But I said um, I told both of them because those two were the ones who were with me on the call I said um, he was moving around a lot back there are you guys sure you searched him are we gonna find a gun in his crotch you know like cause I was worried, I said that to them. So they started searching him again like they started searching him a lot and they're like we don't find, we didn't find anything and I was like okay. I was like I'm just saying like he was moving around so much like to me it was almost like he was trying to get like get to something, that's how much he was moving, cause normally people just sit back there. Especially if you're cuffs hurt, why would you want to move around so much."

23. See also Report, page 67, interview of Griggs by Detectives Camacho and Crowley:
  "CAMACHO: But you were slowing down and.........
  GRIGGS: ........I was slowing down um, when he started to climb on top of the car I started to slow down and get on the radio and say he's climbing on top of my car and then when I had just got done keying the mic I um, put the microphone down and um, he had jumped, so I didn't even have a chance to key up and say he jumped out of the car cause he jumped so I jumped out and, and went to run after him which.......so my car was already like coming to a stop at that point when he jumped, I just don't know I

Ryan Ellis out into the field and murdered him. There was no jumping out of the patrol car, there was no problem with the handcuffs; defendants made all that up.

25. Defendant Mullin describes how he arrived at the scene of Ryan Ellis' injuries at Page 19 of the Report:

"I arrived at the scene and observed Deputy Griggs's patrol vehicle in the middle of the southbound lanes with her overhead lights on. Deputy Griggs. right rear door to her patrol car had the window kicked out, and the frame was bent. ELLIS was lying face down in the street and Deputy Griggs had him at gunpoint. ELLIS was within approximately 10 feet of the right rear door of Deputy Griggs. patrol vehicle. I exited my vehicle and ran up to ELLIS.

I observed ELLIS had a small pool of blood under his head and face areas. ELLIS had no major visible injuries to his head that I could see. I was able to see and hear ELLIS breathing. I requested Code 3 fire to our location along with a supervisor.

Deputy Mah and I conducted a search of ELLIS. person while he was lying on the ground. I told Deputy Mah and Griggs not to move ELLIS any more so as not to further injure him. When I first contacted ELLIS, he was face down and handcuffed in the rear. I left the handcuffs on ELLIS in fear he was going to awaken and become combative.

I advised Deputy Griggs to move her patrol vehicle out of the center of the roadway so we could open one lane of southbound traffic. Deputy Griggs moved her patrol car out of the roadway and pulled it to the west curb line approximately 20 yards south of where ELLIS was lying."

26. The Statement of Mah [Report, page 10-11] also describes how he was called and arrived at the scene of Ryan Ellis' injuries:

"**2034 hours:** I agreed to complete the booking packet so Deputy Griggs can transport ELLIS to the Main Jail. I left the scene to complete the booking packet when Deputy Griggs voiced over the radio she was at the intersection of Elkhorn Boulevard and Thomas Drive. Deputy Griggs also stated ELLIS had broken out her rear window and was trying to escape.

I immediately turned around and drove Code 3 (lights and siren) to the area of Elkhorn Boulevard and Thomas Drive. Deputy Griggs updated her new location over the radio stating she was at the intersection of Elkhorn Boulevard and Watt Avenue and now driving southbound Watt Avenue.

I continued driving toward her location and Deputy Griggs stated ELLIS jumped out of the vehicle and they are at the car wash located south of the intersection of Watt Avenue and Elkhorn Boulevard.

**2038 hours:** I arrived at the car wash and parked my patrol vehicle on the right hand curbside on the southbound lanes of Watt Avenue. I observed ELLIS face down with his hands still handcuffed behind his back, lying in the number two lane of southbound Watt Avenue. I also observed a pool of blood around his head.

I approached ELLIS and Deputy Griggs informed me ELLIS was moving around in the back seat as if he was trying to reach for something in his pocket. Deputy Mullin and I searched ELLIS again but did not find any contraband or weapons on his person.

I also observed ELLIS was breathing on his own but unconscious.

Since ELLIS was breathing on his own, I made sure ELLIS remained on his side by holding his right shoulder up and I monitored his breathing."

27. The Sheriff Report thus confirms that the defendants Mullins, were each individually and personally present and involved in the night's events leading to the death of Ryan Ellis.

28. The defendants also produced:

    a.  A series of photographs of Ryan Ellis in the hospital

    b.  Series of photographs of the handcuffs used on Ryan Ellis

    c.  Series of photographs of Ryan Ellis' belongings/clothing.

    d.  Videos of the following:

        i.  Griggs ICC

        ii.  Mah and Mullin ICC

        iii.  Interview with Breanna Ellis

        iv.  Slavic Church security footage

        v.  AutoZone security footage

        vi.  RiteAid security footage

        vii.  Jiffy Lube security footage

    e.  Audio of patrol car radio.

      The DA's report notes that the video was not on but that the audio file worked, and states:

      "At approximately 20:33:54, the audio depicts Deputy Griggs driving the patrol vehicle away from the scene. Ellis suddenly complains about his handcuffs being too tight at 20:34:30. He becomes angrier and his voice gets louder. At approximately 20:35:43, the sounds of two bumps followed by a louder crash are

heard on the audio. These sounds are consistent with Ellis kicking the window out."

Note: We did get it in MP3 file version. Contrary to the DA's memorandum and conclusions regarding the audio file ["At approximately 20:33:54, the audio depicts Deputy Griggs driving the patrol vehicle away from the scene. Ellis suddenly complains about his handcuffs being too tight at 20:34:30. He becomes angrier and his voice gets louder. At approximately 20:35:43, the sounds of two bumps followed by a louder crash are heard on the audio. These sounds are consistent with Ellis kicking the window out."], we cannot hear the voice or any complaining by Ryan Ellis during the time he was in Deputy Griggs' patrol car. We could not hear any kind of "Boom from kicking the back window it; could not hear any noise of Ryan jumping out of the window; could not hear the deputy make any statement to the effect don't jump or stay put. But, we do hear Deputy Griggs state that Ellis was about to jump, and that he had already broke out the window [53:45]. She also states that she would continue driving so that he would not jump [54:05].

    f.   Audio of 911 call from Breanna Ellis.

## IV.
## FIRST CLAIM FOR RELIEF FOR DAMAGES FOR VIOLATION OF FEDERAL CIVIL RIGHTS ACT, 42 USC SECTION 1983 FOR WHITE COP KILLS BLACK MAN; ENSUING COVER UP; REQUEST FOR INJUNCTIVE RELIEF; AND REQUEST FOR ATTORNEYS FEES

29. This is a first cause of action by plaintiffs Ryan Sylvester and Angela Ellis against defendants Sacramento County Sheriff's Department, and/or Sacramento County, Sheriff Scott Jones, Timothy Mullins, Dick Mah, and Bobi Griggs for violation of the Federal

Civil Rights Act, 42 USC Section 1983, based on a white deputies' wrongful killing of a black man.

30. The allegations set forth above in the preceding paragraphs are incorporated herein.

31. The following facts are alleged and specified herein, along with evidentiary references:

32. Plaintiffs Ryan Sylvester and Angela Ellis are the father and mother of Ryan Ellis who was wrongfully killed by three deputies with the Sacramento County Sheriff's Department in a field off of Watt Ave, Sacramento, on May 4, 2017, and was then covered up by the three deputies pursuant to a custom and policy of coverup white officer's murder of black men. The murder was by three deputies, but the coverup is by the County Sheriff's Department per its custom practice and policy.

33. The arresting officer was a Sacramento County Sheriff's Bobi Griggs, previously sued as defendant "Al." Her co-arresting officers was also Sacramento County Sheriff's Deputies, Timothy Mullin and Dick Mah, who were previously sued herein under the fictitious name of "Et."

34. The video camera in the back seat of the patrol vehicle driven by Defendant Griggs was turned off, against Sheriff's regulations. The defendants were found by the County Inspector General of violating this regulation. Excerpts of the Sacramento County Inspector General report is attached as Exhibit A hereto, and states:
"The department investigated the in-custody death and determined that the Deputy failed to follow Department polices by not seat belting Ellis prior to transporting, not inspecting

Second Amended Complaint

the in-car camera system to ensure the system was operational, and neglect. The
Department issued a written reprimand for the violations."

35. The further reasonable inference of the evidence is that the arresting deputy described
here as the giant white cop deliberately turned off the backseat video camera with the
intent to cover up the death journey that was about to begin. It is not often that a law
enforcement video goes off/shuts off by itself, and when it does go off, it can easily be
inferred that it was the deliberate conduct of the arresting officer. What are the odds that
both the camera would be turned off, and the arresting deputy would forget to seatbelt
him in. The answer is nil. The true story is that the camera was deliberately turned off so
that the ensuing death journey could be covered up, which is exactly what they did and
are still doing to this day.

36. The real truth is that the deceased was easily handcuffed and placed into the patrol car
and was seat belted in. He was an experienced arrestee, and knew he had to cooperate.
Witnesses at the arrest will confirm this fact. He didn't offer resistance, and was
wrongfully murdered by the three deputies, Griggs, Mullin, and Mah.

37. Turning off the video set the scene to permit to deputies et and al along with the Sheriff's
Department to, so far, successfully orchestrate a total lie about what happened. The
official story explained that somehow the deceased, while handcuffed in the back of a
patrol car, driving the wrong way [opposite of the way to the jail], a man who was
untrained in acrobatics, was a long-standing meth addict, out of shape, and had little
athletic ability, was somehow able to crash out the window and fly out of the car to his

death on the pavement. That became the official story of the three deputies, Griggs, Mullin, and Mah.

38. The white cop is described as a giant white cop, like a tree, and extremely muscular powerful man. This giant white cop had a previous run-in with the deceased Ryan Ellis just a few days before the death incident of May 4, 2017, which was a false search of a home of the deceased's relative, a hard-working African-American woman in health services, ransacked her home looking for a gun, and found none. Anger about this frustrating failure set the scene for the death event to follow.

39. The deceased's ex-wife lied to police about the deceased violating a restraining order. The true facts were that he was not near her at all, as she had falsely complained. This woman was motivated by jealousy because the deceased had managed to get a new girlfriend after his release from prison. This African-American woman contributed to the events of the night by falsely claiming a violation of a restraining order.

40. When the giant white cop arrived, a Sacramento County Sheriff's Deputy in uniform and in a marked patrol car [the same as used in the previous warrantless ransacking of the house], witnesses state that they heard the cop say words to the effect "him again" meaning the deceased.

41. Witnesses state that Ryan Ellis was arrested without incident, fully cooperated, and was able to be handcuffed and placed with zero resistance into the back of the patrol vehicle. The deceased was a veteran at being arrested, and fully knew the concept that resistance is futile, and can result in death.

Second Amended Complaint

42. The deputy driving the patrol car went the wrong way away from the jail, and instead took the deceased out in a field off of Watt Ave. behind a car wash, and wrongfully killed him then and there. His body was then removed from this location, and was placed by the deputies on the roadside. They did a cover-up this way to make it look as though he jumped out of the window, with both hands handcuffed, and died on the roadway.

43. The reasonable inference of the evidence is that the giant white cop set this up at by claiming he failed to attach the seatbelt in the back of the patrol car to the deceased. This is simply a false statement made by the giant white cop to cover up what really happened. The Sacramento County Inspector General's office found that this failure to seatbelt the deceased violated the law. See attached Inspector General's report, Exhibit A hereto:

> "The department investigated the in-custody death and determined that the
> Deputy failed to follow Department polices by not seat belting Ellis prior to
> transporting, not inspecting the in-car camera system to ensure the system was
> operational, and neglect. The Department issued a written reprimand for the
> violations."

44. Plaintiff Ryan Sylvester was at the hospital where his son was brought in. There were some disturbing physical attributes of the deceased body that were easily visible, and caused the attending ER ICU nurse to tell Plaintiffs words to the effect "no way did this happen by falling out of a car." The physical aspects included: virtually no wounds on his entire body. See attached Coroner's report, Exhibit B hereto. There was one very weird injury though, at the very top of the deceased head his entire scalp had been scalped Indian style. It was severed from the cranium. This kind of odd injury would be consistent with a cop using his baton to strike the top part of the deceased's head, the very

top part. It sliced his head. There was no shattered glass found in the deceased's body, as you would expect if he had somehow crashed through a sheriff's patrol car back window and flew out of the car so fast that the two deputies couldn't have stopped it. There were very few abrasions. The nurse explained that there should have been way more abrasions and physical injures to be consistent with this official "flew out of the window" story.

45. Plaintiff Ryan Sylvester is the father of the deceased, and went to the Sheriff's Department to obtain a copy of the Sheriff's report on the death of his son. The Sheriff's Department has a custom and policy of refusing to provide these reports to parents of the deceased. The Sheriff's Department is refusing still to provide the report. They will not identify the names of the two deputies that did this killing. The County Inspector General's report [Exhibit A] likewise does not name these two individuals. None of the series of news reports on this matter named the names of the three deputies. Plaintiffs still do not know the names of these two deputies.

46. This case contains a challenge to this custom and policy of the Sheriff's Department to cover up killings by deputies; this custom and policy constitutes obstruction of justice; a denial of substantive and procedural due process; and should be stopped through injunctive relief as is allowed under *Ex Parte Young*, 209 U.S. 123, 155-156 (1908):

> "The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action."

Second Amended Complaint

47. The coverup included a failure of anyone to ever to look in the field behind the car wash where the death occurred. Later, the deceased's cousin and her mom went out to this field to see if they could find anything. They found the deceased's cell phone broken with battery off, in this field. It is normal protocol to remove cell phones from an arrestee and place them into a Ziploc bag to be kept by the transporting officer until arrival at the Sacramento Jail, and to then be given over to property department at the jail. In this example, the deputy somehow either kept the cell phone on his person, or maybe forgot to remove it from the deceased. Then, in the course of beating the deceased to death, the phone fell out of either the deputy's pocket or the deceased's pocket. When the deputies then brought the body to the side of the road, the didn't know about, or see, the cell phone lying in the weeds. Testimony on this point will include two eyewitnesses to finding the cell phone: Aviance "Avi" Sylvester [Ryan Ellis's cousin] and Avi's mother Tiffany. Further testimony on this point is by Deanna Diamond, Avi's sister, who saw the phone.

48. Unfortunately, the phone was inadvertently given away during the process of moving, so we no longer have the physical phone.

49. Defendant Sacramento County Sheriff and/or Sacramento County's conduct in permitting, allowing, enforcing, implementing a custom, policy, and practice to cover up a white cop killing a black man constitutes a past, current, and future problem for Plaintiffs, the parents of the deceased. They seek justice, and so far, have been deprived of justice. The Sheriff's Department misled the County Inspector General's office. The true story, as described above, was not told. As part of this policy of cover up, The Sheriff's department has adopted an official policy and practice of prohibiting the release

Second Amended Complaint

of a Sheriff's investigative report on a white cop killing a black man. This policy is

contrary to state law as set forth in Evidence Code section 1040:

"(a) As used in this section, "official information" means information acquired in

confidence by a public employee in the course of his or her duty and not open, or

officially disclosed, to the public prior to the time the claim of privilege is made.

(b) A public entity has a privilege to refuse to disclose official information, and to

prevent another from disclosing official information, if the privilege is claimed by

a person authorized by the public entity to do so and either of the following apply:

(1) Disclosure is forbidden by an act of the Congress of the United States or a

statute of this state.

(2) Disclosure of the information is against the public interest because there is a

necessity for preserving the confidentiality of the information that outweighs the

necessity for disclosure in the interest of justice; but no privilege may be claimed

under this paragraph if any person authorized to do so has consented that the

information be disclosed in the proceeding. In determining whether disclosure of

the information is against the public interest, the interest of the public entity as a

party in the outcome of the proceeding may not be considered.

(c) Notwithstanding any other law, the Employment Development Department

shall disclose to law enforcement agencies, in accordance with subdivision (i) of

Section 1095 of the Unemployment Insurance Code, information in its possession

relating to any person if an arrest warrant has been issued for the person for

commission of a felony.

50. The cover-up conduct by Defendant Sacramento County or the Sacramento County

Sheriff's Department is in violation of plaintiff's federally-protected rights to substantive

and procedural due process of law, a right guaranteed under the 5th and 14th Amendments to the United States Constitution. For adopting this policy specifically to silence issues on killings of black people, the Department and County have instituted an official custom, policy and practice that violates the Equal Protections clause of the 14th Amendment to the United States Constitution.

51. This wrongdoing is of a continuing nature, and is expected to continue into the future unless enjoined by the issuance of an appropriate injunction against defendant Sheriff Scott Jones, in his official capacity, and pursuant to the procedure permitting official capacity suits seeking injunctive relief. See *Ex Parte Young*, 209 U.S. 123, 155-156 (1908), quoted above, allowing for an official capacity suit to obtain needed injunctive relief.

52. Plaintiffs also seeks injunctive relief as follows against Sheriff Scott Jones in his official capacity as described above:

An order to cease the cover-up conduct by Defendant Sacramento County or the Sacramento Sheriff's Department as being in violation of plaintiff's federally-protected rights to substantive and procedural due process of law, a right guaranteed under the 5th and 14th Amendments to the United States Constitution, as it adopted this policy specifically to silence issues on killings of black people, the Department and County have instituted an official custom and policy that violates the equal protections clause of the 14th Amendment to the United States Constitution.

53. Defendants' conduct in wrongfully killing Ryan Ellis on May 4, 2017 in the fields behind the car wash on Watt Ave, constitute a violation of plaintiff's substantive due process

right including the right of familial relationship with the deceased. The fact that this was done by a white cop against a black man and woman's son in and of itself wouldn't constitute an Equal Protection clause violation. In this case, the reasonable inferences show that this was done with anger towards the deceased based on the unsuccessful search days before for a gun, a search done by deputies Et and Al; a return by the deputies to the area to arrest the deceased a few days later, in anger; the fact that witnesses confirm the deceased did not resist; and that the death trip was pre-mediated with backseat video camera off, and a drive in the opposite direction from the jail. This kind of summary execution would not occur, or would highly rarely occur, to a white suspect. The ensuing cover up generates a further reasonable inference of this racially based motivation to deprive Plaintiffs of their federally-protected civil rights.

54. Plaintiffs also cite the federal obstruction of justice statute, 18 USC section 1510, a copy of which is attached hereto as Exhibit C, as created a further federally-protected right. Defendants conduct in giving a false story about what happened, and in coverup the wrongful killing, and in obstructing plaintiffs ability to obtain any investigative reports, constitutes a violation of 18 USC section 1510 prohibiting obstruction of justice, and as such have violated plaintiffs federally protected rights and the Federal Civil Rights Act.

55. Defendants' violations of the Federal Civil Rights Act were the substantial factor in causing Plaintiffs' general damages in an amount according to proof, but in excess of $5 million, including, but not limited to the following:

    a.  Loss of support and services in money or in kind from the date of the death of decedent [May 4, 2017] to the extent of the Plaintiffs' Decedent's and Plaintiffs' normal life expectancies;

b. Loss of care, comfort, society, protection, companionship, instruction, guidance, tutelage, counsel, moral support and advice;

c. Physical and mental pain and suffering;

d. Grief, emotional distress, and sorrow;

e. Loss of enjoyment of life;

f. Loss of the value of not having to live one's life alone;

g. Loss of the pleasures of living;

h. Loss of love;

i. Loss of solace;

j. Loss of typical family experiences now supplanted by forever being an air crash family;

k. Loss of consortium;

l. Property loss and damage;

m. Business loss and damage.

56. Plaintiff also prays for attorney's fees in an amount according proof, pursuant to 42 USC section 1988.

57. Plaintiffs have also learned for the first time of the stream of events described in the Sheriff's Report wherein the deputy who handcuffed Ryan Ellis placed the cuffs on tightly, tightly enough that Ryan Ellis was screaming for help, and in desperation jumped out of the car. If this set of facts is true, then defendant Griggs is liable for intentionally and willfully violating Ryan Ellis' rights under the 4th amendment prohibition of unreasonable searches and seizures (it is unreasonable to seize a suspect in this manner); 5th Amendment and 14th Amendment due process violation as to allowable level of

torture and pain to a compliant and submissive suspect; the suspect is in the category of a pre-trial detainee, so the 14th Amendment due process clause applies to prohibit this type of torture to a complaint suspect/pre-trial detainee; and remains the substantial cause of all further events leading to the death of Ryan Ellis.

58. As further evidence of this form of race-based discrimination, plaintiffs cite the fact that a black man who was generally compliant with the officers, was nevertheless tortured through the use of improperly tight handcuffs.

59. In sum, if it is true as Deputy Griggs that the handcuffs were on so tight as to force him into a mental frenzy, leading to superhuman capabilities resulting in jumping out of a police car, then it is also true that the handcuffs were on in a manner that constitutes a form of torture on a generally compliant arrestee. Unlawful torture, which was a substantial factor in bringing about Ryan Ellis' death.

60. The conduct constitute torture as defined in California Penal Code section 206:
"Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. The crime of torture does not require any proof that the victim suffered pain."

61. See also Penal Code section 206.1: "Torture is punishable by imprisonment in the state prison for a term of life."

62. The report by the District Attorney concludes that there is no homicide under any theory of homicide. There was, however, a torture crime staring at investigators, and none of them found a case for torture. If Ryan Ellis did not in fact suffer torture or other extreme pain from the handcuffing, then how did he go from generally compliant arrestee to a man in a mental frenzy with momentary superhuman powers enough to kick out, and jump from the patrol vehicle? This is their proffer of the story, which Plaintiffs submit is impossible to have occurred.

63. The Coroner's report, Exhibit B hereto, states at page 3, paragraph 3:
"The right wrist shows contusion on the posterior surface and focally on the anterior medial and lateral surfaces. This measures 1 ⅝ inch wide. The medial surface of the left arm shows a road rash type abrasion measuring 13 x 3 ½ inches. The lateral proximal left forearm shows a ½ inch abrasion. The left wrist has an abrasion measuring ¾ inch on the anterolateral surface. The posterolateral left wrist shows linear parallel abrasions measuring ¼ and 1 inch in length."

64. Handcuffs on too tightly will produce a scar of parallel line across the wrist, like a bracelet. The ¾-inch abrasion wound found by the coroner is consistent with Ryan Ellis being dragged on the pavement or ground with the cuffs injuring him along the way. If he was reluctant to walk to the patrol car, as noted by the deputies Mullin and Mah, a reasonable inference would that he would triply slow in being escorted into the field in an area well-behind the place where defendant deputies claim his body was found. And so, they dragged him, and while dragging him, the handcuffs made the ¾-inch abrasions.

Second Amended Complaint

65. The fact that there was that much play in the handcuffs [enough for ¾ inch of movement] suggests that the handcuffs were not on that tightly.

66. The coroner's report does not state that there was any type of any parallel line scarring along either Ryan Ellis's right or left wrists. This also suggest that the handcuffs were not on too tightly.

67. Apparently, the extreme pain of the handcuffs were not spoken of while deputies Mullin and Mah were present. They make no mention of it. Deputy Griggs does not specify when she first heard Ryan Ellis complain about the handcuffs being on too tight.

68. Plaintiffs submit that the handcuffing complaints are fabrications made up by the Sheriff deputies as a way to explain the unjustified killing of Ryan Ellis. In other words, they made it all up. The deputies' story is also belied by their description of how Ryan Ellis, an out of shape drug addicted parolee/convict would be able while handcuffed to leap through the window of a moving sheriff vehicle. The part that shows this is truly a lie by the deputies is why would a person whose problem was handcuffs choose to solve the problem by jumping out of the patrol vehicle.

69. One reasonable and obvious inference from the deputies' story is that it is substantial fabricated and made up.

70. Plaintiffs further cite the fact that the high-level, multi-agency [Sheriff Department Homicide Division; Sacramento Inspector General's Office; and Sacramento County District Attorney's Office] review of this sheriff killing of a black man did not include

Second Amended Complaint

the black man's family member's in the investigation process. Had they done so, they

should learned the first of many lies: 1. They say Ryan Ellis did not have phone on him,

but he did have a phone; it was found in the field well behind the area where they claim

he had come to after jumping out of the car. They also would have found out about Nurse

Elizabeth at the ER that there was no way that happened to Ryan Ellis was as what was

being described by the sheriff deputies. The man did not suffer the kind of injuries that

would have occurred had he jumped out of the car.

71. Another circumstance is that the Deputies reports confirms that the Inspector General

    also found that the backseat video in the patrol vehicle was not operating.

72. These pieces of evidence show the basic attitudes and practices of law enforcement

    towards black people.

73. Another circumstance that generates a reasonable inference that the official sheriff report

    about what happened is false is the odd coincidence of how many different things would

    have to mess up for the incident to occur. For example, the 911 call that resulted in the

    three deputies' arrival at the scene was called in by a woman named Breanna Ellis, the

    ex-wife of Ryan Ellis. Breanna had a domestic violence restraining order against Ryan

    Ellis, though plaintiffs' counsel has not seen it. It is discussed and described in the 911

    transcripts tapes as a DV restraining order. Unfortunately, Ryan Ellis had a new girlfriend

    that happened to live near the house of his ex, but outside of the restraining order

    distance. Breanna called in the offense of violation of restraining order, but noted in her

    call in to 911 [Audio of 911 call, time marker 0:36 – 0:48]:

    "Q. So is he within the distance that he is supposedly not supposed to be?

A. Um, I'm not sure. But,....I don't know how many feet or yards that is, but..."

74. It was thus incumbent on the deputies to come to the site to investigate the crime of violation of restraining order and whether there was a warrant due to a parole violation from the same conduct. In that way, Deputy Mullin reports after handcuffing Ryan Ellis he placed Ryan Ellis into the patrol vehicle without seat belting him into the car: "ELLIS was placed in the right rear seat of Deputy Griggs. patrol car (122-113). ELLIS was not seat belted in the rear of the patrol vehicle because he was just detained at the time. We still needed to confirm the warrant, and make decisions on who was going to transport ELLIS to jail.

*** 

I advised ELLIS he was under arrest for a parole violation warrant, and that's why he was in the back of the patrol car. ELLIS became uncooperative and demanded to speak with a parole agent."

75. That detention should have allowed the deputies a safe and secure way of investigating the issue about whether Ryan Ellis had in fact been within the prohibited area of the restraining order. If he wasn't guilty of a restraining order violation, then the purpose of the detention would end, and he should have then been released. The deputies didn't do this investigation, and instead drove Ryan Ellis away. This error in detention placement of a suspect without seat-belting him, then driving away in the opposite direction of the jail, then having a defective video tape in the back seat video cam, then having a problem with the handcuffs being on too tough, all leading to Ryan Ellis somehow gaining super human strength to go out the window of a moving car on Watt Ave., are all premised on all these errors happening at the same time.

Second Amended Complaint

based discrimination. If Ryan Ellis had been white, the deputies would have conducted a proper investigation before cuffing him.

WHEREFORE, plaintiffs pray for relief as set forth below.

## V.
## SECOND CLAIM FOR RELIEF FOR VIOLATION OF UNRUH ACT, CIVIL CODE SECTION 51 ET SEQ, SEEKING EQUITABLE REMEDIES ONLY

79. This is a second cause of action against Defendants Sacramento County Sheriff's Department, and/or Sacramento County, Sheriff Scott Jones, and Sacramento County Deputy Sheriffs Timothy Mullin, Dick Mah, and Bobi Griggs, for violation of California's Unruh Civil Rights Act, Civil Code section 51 et seq., for injunctive relief only.

80. The allegations of the preceding paragraphs are incorporated herein as though set forth in full.

81. Plaintiffs are not seeking any type of damages or monetary relief in this second cause of action, only injunctive relief.

82. The conduct of defendants violates the Unruh Civil Rights Act in that the conduct constitutes race-based discrimination against African-Americans.

83. Plaintiffs seek injunctive relief as follows against Sheriff Scott Jones in his official capacity as described above:

An order to cease the cover-up conduct by Defendant Sacramento County or the Sacramento Sheriff's Department as being in violation of plaintiff's federally-protected rights to substantive and procedural due process of law, a right guaranteed under the 5th and 14th Amendments to the United States Constitution, as it adopted this policy specifically to silence issues on killings of black people, the Department and County have instituted an official custom and policy that violates the equal protections clause of the 14th Amendment to the United States Constitution.

84. Plaintiffs have also learned for the first time of the stream of events described in the Sheriff's Report wherein the deputy who handcuffed Ryan Ellis placed the cuffs on tightly, tightly enough that Ryan Ellis was screaming for help, and in desperation jumped out of the car. If this set of facts is true, then defendant Griggs is liable for intentionally and willfully violating Ryan Ellis' rights under the 4th amendment prohibition of unreasonable searches and seizures (it is unreasonable to seize a suspect in this manner); 5th Amendment and 14th Amendment due process violation as to allowable level of torture and pain to a compliant and submissive suspect; the suspect is in the category of a pre-trial detainee, so the 14th Amendment due process clause applies to prohibit this type of torture to a complaint suspect/pre-trial detainee; and remains the substantial cause of all further events leading to the death of Ryan Ellis.

85. As further evidence of this form of race-based discrimination, plaintiffs cite the fact that a black man who was generally compliant with the officers, was nevertheless tortured through the use of improperly tight handcuffs. Plaintiffs further cite the fact that the high-level, multi-agency [Sheriff Department Homicide Division; Sacramento Inspector General's Office; and Sacramento County District Attorney's Office] review of this

Second Amended Complaint

sheriff killing of a black man did not include the black man's family member's in the investigation process. Had they done so, they should learned the first of many lies: 1. They say Ryan Ellis did not have phone on him, but he did have a phone; it was found in the field well behind the area where they claim he had come to after jumping out of the car. They also would have found out about Nurse Elizabeth at the ER that there was no way that happened to Ryan Ellis was as what was being described by the sheriff deputies. The man did not suffer the kind of injuries that would have occurred had he jumped out of the car.

86. As further evidence of this form of race-based discrimination, plaintiffs cite the fact that a black man who was generally compliant with the officers, was nevertheless tortured through the use of improperly tight handcuffs.

87. In sum, if it is true as Deputy Griggs that the handcuffs were on so tight as to force him into a mental frenzy, leading to superhuman capabilities resulting in jumping out of a police car, then it is also true that the handcuffs were on in a manner that constitutes a form of torture on a generally compliant arrestee. Unlawful torture, which was a substantial factor in bringing about Ryan Ellis' death.

88. The conduct constitute torture as defined in California Penal Code section 206:
"Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. The crime of torture does not require any proof that the victim suffered pain."

89. See also Penal Code section 206.1: "Torture is punishable by imprisonment in the state prison for a term of life."

90. The report by the District Attorney concludes that there is no homicide under any theory of homicide. There was, however, a torture crime staring at investigators, and none of them found a case for torture. If Ryan Ellis did not in fact suffer torture or other extreme pain from the handcuffing, then how did he go from generally compliant arrestee to a man in a mental frenzy with momentary superhuman powers enough to kick out, and jump from the patrol vehicle? This is their proffer of the story, which Plaintiffs submit is impossible to have occurred.

91. The Coroner's report, Exhibit B hereto, states at page 3, paragraph 3:

"The right wrist shows contusion on the posterior surface and focally on the anterior medial and lateral surfaces. This measures 1 ⅞ inch wide. The medial surface of the left arm shows a road rash type abrasion measuring 13 x 3 ½ inches. The lateral proximal left forearm shows a ½ inch abrasion. The left wrist has an abrasion measuring ¾ inch on the anterolateral surface. The posterolateral left wrist shows linear parallel abrasions measuring ¼ and 1 inch *in* length."

92. Handcuffs on too tightly will produce a scar of parallel line across the wrist, like a bracelet. The ¾-inch abrasion wound found by the coroner is consistent with Ryan Ellis being dragged on the pavement or ground with the cuffs injuring him along the way. If he was reluctant to walk to the patrol car, as noted by the deputies Mullin and Mah, a reasonable inference would that he would triply slow in being escorted into the field in an

area well-behind the place where defendant deputies claim his body was found. And so, they dragged him, and while dragging him, the handcuffs made the ¾-inch abrasions.

93. The fact that there was that much play in the handcuffs [enough for ¾ inch of movement] suggests that the handcuffs were not on that tightly.

94. The coroner's report does not state that there was any type of any parallel line scarring along either Ryan Ellis's right or left wrists. This also suggest that the handcuffs were not on too tightly.

95. Apparently, the extreme pain of the handcuffs were not spoken of while deputies Mullin and Mah were present. They make no mention of it. Deputy Griggs does not specify when she first heard Ryan Ellis complain about the handcuffs being on too tight.

96. Plaintiffs submit that the handcuffing complaints are fabrications made up by the Sheriff deputies as a way to explain the unjustified killing of Ryan Ellis. In other words, they made it all up. The deputies' story is also belied by their description of how Ryan Ellis, an out of shape drug addicted parolee/convict would be able while handcuffed to leap through the window of a moving sheriff vehicle. The part that shows this is truly a lie by the deputies is why would a person whose problem was handcuffs choose to solve the problem by jumping out of the patrol vehicle.

97. One reasonable and obvious inference from the deputies' story is that it is substantial fabricated and made up.

98. Plaintiffs further cite the fact that the high-level, multi-agency [Sheriff Department Homicide Division; Sacramento Inspector General's Office; and Sacramento County District Attorney's Office] review of this sheriff killing of a black man did not include the black man's family member's in the investigation process. Had they done so, they should learned the first of many lies: 1. They say Ryan Ellis did not have phone on him, but he did have a phone; it was found in the field well behind the area where they claim he had come to after jumping out of the car. They also would have found out about Nurse Elizabeth at the ER that there was no way that happened to Ryan Ellis was as what was being described by the sheriff deputies. The man did not suffer the kind of injuries that would have occurred had he jumped out of the car.

99. Another circumstance is that the Deputies reports confirms that the Inspector General also found that the backseat video in the patrol vehicle was not operating.

100.    These pieces of evidence show the basic attitudes and practices of law enforcement towards black people.

101.    Another circumstance that generates a reasonable inference that the official sheriff report about what happened is false is the odd coincidence of how many different things would have to mess up for the incident to occur. For example, the 911 call that resulted in the three deputies' arrival at the scene was called in by a woman named Breanna Ellis, the ex-wife of Ryan Ellis. Breanna had a domestic violence restraining order against Ryan Ellis, though plaintiffs' counsel has not seen it. It is discussed and described in the 911 transcripts tapes as a DV restraining order. Unfortunately, Ryan Ellis had a new girlfriend that happened to live near the house of his ex, but outside of the restraining

order distance. Breanna called in the offense of violation of restraining order, but noted in her call in to 911 [Audio of 911 call, time marker 0:36 – 0:48]:

"Q. So is he within the distance that he is supposedly not supposed to be?

A. Um, I'm not sure. But,....I don't know how many feet or yards that is, but…"

102.       It was thus incumbent on the deputies to come to the site to investigate the crime of violation of restraining order and whether there was a warrant due to a parole violation from the same conduct. In that way, Deputy Mullin reports after handcuffing Ryan Ellis he placed Ryan Ellis into the patrol vehicle without seat belting him into the car:

"ELLIS was placed in the right rear seat of Deputy Griggs. patrol car (122-113). ELLIS was not seat belted in the rear of the patrol vehicle because he was just detained at the time. We still needed to confirm the warrant, and make decisions on who was going to transport ELLIS to jail.

*** 

I advised ELLIS he was under arrest for a parole violation warrant, and that's why he was in the back of the patrol car. ELLIS became uncooperative and demanded to speak with a parole agent."

103.       That detention should have allowed the deputies a safe and secure way of investigating the issue about whether Ryan Ellis had in fact been within the prohibited area of the restraining order. If he wasn't guilty of a restraining order violation, then the purpose of the detention would end, and he should have then been released. The deputies didn't do this investigation, and instead drove Ryan Ellis away. This error in detention placement of a suspect without seat-belting him, then driving away in the opposite direction of the jail, then having a defective video tape in the back seat video cam, then

Second Amended Complaint

76. It is said that lightening doesn't strike twice, it certainly doesn't strike five times. Five strikes and you are out. Strike 1: Placing handcuffs on too tight. Strike 2: placing Ryan Ellis in the patrol vehicle with no seatbelt on; Strike 3: immediately driving away; Strike 4: the video doesn't work; Strike 5: went the opposite way of the jail on Watt Avenue.

77. Plaintiffs state the decision to immediately handcuff Ryan Ellis without having established a crime was done because he is black. Black man gets zero investigation before being cuffed. The deputy states it was a detention, which itself can be a valid hand-cuffing for officer safety purposes. The same rationale that allows officers to handcuff occupants of a premises being searched also applies to other situations in which an officer feels he or she may be at risk.

78. As a training bulletin used by the Los Angeles Police Department (cited here by way of showing law enforcement generally accepted standards) states: "The handcuffing of an arrestee is not based on rigid criteria. It is determined by the nature of each situation as perceived by the officer." If an officer feels that placing a person in handcuffs is the best way to ensure his or her own safety, then a court would not likely find that the officer had violated the rights of the person being detained. So, for example the deputies can handcuff a suspect and place him in the patrol vehicle as a safety mechanism pending an investigation into the crime of a restraining order violation. The reason this safety excuse doesn't work in this case is that the deputies didn't do that investigation. Instead, they basically went right to handcuff and put in patrol car, and then didn't do a follow-through to see if the restraining order was actually violated or not. A reasonable inference from these facts is that the conduct of the officers was motivated in substantial factor by race-

Second Amended Complaint

having a problem with the handcuffs being on too tough, all leading to Ryan Ellis

somehow gaining super human strength to go out the window of a moving car on Watt

Ave., are all premised on all these errors happening at the same time.

104.    It is said that lightening doesn't strike twice, it certainly doesn't strike five times.

Five strikes and you are out. Strike 1: Placing handcuffs on too tight. Strike 2: placing

Ryan Ellis in the patrol vehicle with no seatbelt on; Strike 3: immediately driving away;

Strike 4: the video doesn't work; Strike 5: went the opposite way of the jail on Watt

Avenue.

105.    Plaintiffs state the decision to immediately handcuff Ryan Ellis without having

established a crime was done because he is black. Black man gets zero investigation

before being cuffed. The deputy states it was a detention, which itself can be a valid

hand-cuffing for officer safety purposes. The same rationale that allows officers to

handcuff occupants of a premises being searched also applies to other situations in which

an officer feels he or she may be at risk.

106.    As a training bulletin used by the Los Angeles Police Department (cited here by

way of showing law enforcement generally accepted standards) states: "The handcuffing

of an arrestee is not based on rigid criteria. It is determined by the nature of each situation

as perceived by the officer." If an officer feels that placing a person in handcuffs is the

best way to ensure his or her own safety, then a court would not likely find that the

officer had violated the rights of the person being detained. So, for example the deputies

can handcuff a suspect and place him in the patrol vehicle as a safety mechanism pending

an investigation into the crime of a restraining order violation. The reason this safety

excuse doesn't work in this case is that the deputies didn't do that investigation. Instead, they basically went right to handcuff and put in patrol car, and then didn't do a follow-through to see if the restraining order was actually violated or not. A reasonable inference from these facts is that the conduct of the officers was motivated in substantial factor by race-based discrimination. If Ryan Ellis had been white, the deputies would have conducted a proper investigation before cuffing him.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows

1. For Judgment to be entered against Defendants Sacramento County Sheriff's Department, Sacramento County, Sheriff Scott Jones, Timothy Mullin, Dick Mah, and Bobi Griggs.

2. As to the First Cause of Action, for general and compensatory damages in an amount according to proof, but in excess of $5,000,000.00

3. As to the First and Second Causes of Action, for injunctive relief as follows:
    An order to cease the cover-up conduct by Defendant Sacramento County or the Sacramento Sheriff's Department as being in violation of plaintiff's federally-protected rights to substantive and procedural due process of law, a right guaranteed under the 5th and 14th Amendments to the United States Constitution, as it adopted this policy specifically to silence issues on killings of black people, the Department and County have instituted an official custom and policy that violates the equal protections clause of the 14th Amendment to the United States Constitution.

4. For Attorney's Fees according proof, pursuant to 42 USC section 1988;

5. For Costs of Suit;

Second Amended Complaint

41

6. For such other relief as the Court deems just and proper.


Respectfully submitted                              Date: August 3, 2021


//s// Herman Franck, Esq.

_____
Herman Franck, Esq.
Attorney for Plaintiffs
Ryan Sylvester and Angela Ellis

Second Amended Complaint

42

## DEMAND FOR JURY TRIAL

Plaintiff herewith submit this DEMAND FOR JURY TRIAL, and request a jury trial as to all claims asserted herein that are triable to a jury.

Respectfully Submitted,

__/s/ Herman Franck, Esq.__                                    August 3, 2021
Herman Franck, Esq.
Attorney for Plaintiffs Ryan Sylvester
And Angela Ellis

Second Amended Complaint

43

## LIST OF EXHIBITS

Exhibit A: Excerpts of Sacramento County Inspector General's Report for 2017

Exhibit B: Coroner's Report re Ryan Ellis

Exhibit C: 18 USC section 1510

Second Amended Complaint

# Exhibit A



# Office of Inspector General

Annual Report
2017

Rick Braziel
Inspector General

## Use of Force

The Sheriff's Department currently does not utilize a comprehensive reliable use of force tracking system. While officer involved shootings, Taser, and the use of 40mm less lethal weapons are tracked, the use of other less lethal force is not documented in a standardized system that allows for the necessary analysis. The department has selected a software system that will allow the Department to track and report all uses of force. The tracking system is scheduled for implementation later this year.

## Early Intervention System

The Office of Inspector General is working with the Sheriff's Department to implement an Early Intervention System (EIS). The goal is to implement a system that is comprehensive in scope and designed to identify employees who are at risk of an adverse incident. The key is identifying incidents and behaviors that when viewed in isolation may or may not create concern, but when viewed holistically may be cause for review and possible intervention. Review triggers from various incidents are established based on frequency within a period. For example, two motor vehicle collisions within 180 days, three uses of force within 90 days, three citizen complaints within 180 days, or three inmate grievances within 180 days are all examples of appropriate review triggers. A review may also be triggered by several different incidents combined; for example, five of any of these incidents occurring within 180 days. The benefit of an EIS is that it focuses on identifying underlying causes at the earliest opportunity therefore allowing for a customized intervention.

The software necessary to implement an EIS has been selected and is scheduled for implementation later this year.

## Deaths in Custody

There were six in custody deaths during 2017. This compares to two in 2016. The OIG reviewed all documents including Department reports, Coroner's report, and Crime Lab results of each death.

### Johnathon Carroll – January 6, 2017 -- Main Jail

On January 6, 2017 at 4:18 a.m. Carroll was discovered in his cell unresponsive by deputies at the Main Jail conducting a routine cell check. Medical assistance was immediately requested, chest compressions were started, and a defibrillator was used in an attempt to resuscitate Carroll. Jail medical staff assisted in the effort along with Sacramento City Fire Department. At 4:46 a.m. Carroll was pronounced deceased.

A review of available reports and logs revealed that Carroll had been in custody for over a year on sex assault charges. He was housed alone and did not have problems with other inmates. During a routine cell check at 3:21 a.m. Carroll appeared to be fine. It was during the next hourly cell check that a deputy noticed that Carroll appeared blue. Deputies entered the cell, removed string fashioned from torn clothing from around his neck and began first aid.

A review of the cell check log documented that the cell was checked hourly with no unusual activity noted. Inmates stated that Carroll seem upset the day before following a phone call and that he said that he would be gone tomorrow. This was perceived as meaning that he was being sentenced and would be going to prison.

The Coroner's Office determined the cause of death was suicide by way of ligature asphyxiation.

Tom Korrell – March 8, 2017 -- Main Jail

On March 8, 2017 at 1:20 a.m. deputies were alerted by an arrestee in in a booking intake cell that another inmate had hung himself. Medical assistance was immediately requested, chest compressions were started, and a defibrillator was used in an attempt to resuscitate Korrell. Jail medical staff assisted in the effort along with Sacramento City Fire Department. At 1:42 a.m. Korrell was pronounced deceased.

A review of available reports and logs revealed that Korrell had been arrested March 7, 2017 at 10:50 p.m. by Sacramento Police and placed on a parole hold. He was booked into the Main Jail at 11:58 p.m. At the time of the incident he was housed with two other arrestees in male booking cell #4. There was nothing to indicate that he had problems with other inmates or that anything was unusual until deputies were summoned by an arrestee.

Upon entering the holding cell deputies discovered Korrell hanging from a ligature made of his shirt tied to a metal partition used to separate the toilet from public viewing. Deputies removed the string from around his neck and began first aid.

A review of the cell check log noted that the cell was last checked at midnight and 1:00 a.m. However, the video recordings of the area showed deputies checking the cell at 12:29 a.m. and then when entering to render aid at 1:20 a.m. The Sheriff's Department discovered the discrepancy during the Department's internal review of the death and an Internal Investigation followed. Two deputies were disciplined for failing to accurately log the time that the cell was checked.

The Coroner's Office determined the cause of death was suicide by way of ligature asphyxiation.

The Toxicology report determined the following drugs in Monroe's system:

| Alcohol | .03% |
| Methamphetamine | 207 ng/mL |
| Nordiazepam | 515 ng/mL |

Normal concentrations in recreational use of methamphetamine are 0.01 to 2.5 mg/L (median 0.6 mg/L = 600 ng/ml). Concentrations above this range will likely be associated with severe, possibly life threatening, toxicity.[1]

---

[1] National Highway Traffic Safety Administration. *Drugs and Human Performance Fact sheets.* https://one.nhtsa.gov/people/injury/research/job185drugs/methamphetamine.htm

### Silas Boston – April 24, 2017 – UC Davis Medical Center

On April 24, 2017 Boston passed away while under palliative care at the University California Davis Medical Center. Boston was in custody following his arrest on December 1, 2016 by US Marshalls for the 1978 murder of a British couple in Belize. Boston had failing health with numerous medical conditions, multiple failing organs, and a do not resuscitate (DNR) order. He passed away at the hospital while under care of the UC Davis Medical Center.

### Ryan Ellis – May 4, 2017 – Watt Avenue near Bolivar Avenue

On May 4, 2017, at 7:44 p.m., deputies responded to a domestic disturbance in North Highlands. Upon arrival deputies detained and later arrested Ellis as a parolee-at-large. While being transported to jail Ellis, who was handcuffed but not seat belted, was able to kickout the rear window of the Sheriff's patrol vehicle while the patrol vehicle was driving on Watt Avenue near Elkhorn Boulevard. The deputy continued driving the patrol vehicle for about a half-mile when Ellis, still handcuffed, jumped out of the vehicle and landed on the road.

Sacramento Metropolitan Fire Department responded and transported Ellis to Mercy San Juan Hospital in critical condition. Ellis died May 5, 2017 from his injuries.

The department investigated the in-custody death and determined that the Deputy failed to follow Department polices by not seat belting Ellis prior to transporting, not inspecting the in-car camera system to ensure the system was operational, and neglect. The Department issued a written reprimand for the violations.

The Coroner's Office determined the cause of death was craniocerebral[2] blunt force trauma.

The Toxicology report determined the following in Ellis' system:

| | |
|---|---|
| Alcohol | .00% |
| Methamphetamine | 272 ng/ml |
| Amphetamine | 27 ng/ml |

### JC Feagins – July 6, 2017 – Main Jail

On July 6, 2017 at 4:50 a.m. deputies were alerted by Feagins cellmate that Feagins would not wake up for breakfast. The cell mate reported that when the cell door opened for chow he left to go get food and as he did he heard Feagins cough. When he returned Feagins would not wake up and the cellmate pushed the emergency button which summoned deputies. Deputies arrived and were not able to get a response from Feagins. Feagins had a slight pulse and medical staff was requested. Medical staff was also unable to get a response from Feagins and his pulse was lost. Medical aid, including chest compressions and an AED, was given. The Fire Department arrived at 5:05 a.m. and at 5:22 a.m. Feagins was pronounced deceased.

A review of available reports and logs revealed that Feagins had been booked into the Sacramento County Main Jail July 5, 2017 by Sacramento Police for spousal abuse. During the booking process Feagins cleared medial intake at 1:25 a.m. His records indicated that at 8:38 p.m. the same day he declined medical follow-up by staff. At 3:39 a.m. on July 6th staff

---

[2] Relating to the skull and brain. https://medical-dictionary.thefreedictionary.com/craniocerebral

# Exhibit B



**County of Sacramento**
Department of Coroner
4800 Broadway, Suite 100
Sacramento, CA 95820-1530

Kimberly D. Gin
**Coroner**

---

☒ Autopsy       ☐ External Examination

NAME: ELLIS, RYAN    CASE NO. 17-02522

POSTMORTEM DATE: 05/08/17   TIME: 10:30

INVESTIGATOR: Zhanna Khabatyuk

---

**AUTOPSY FINDINGS:**

1. Craniocerebral blunt force injuries
2. Cutaneous and subcutaneous blunt force injuries of torso and extremities
3. Pancreas, hemorrhage, focal
4. Methamphetamine Intoxication (See Toxicology report)

**CAUSE OF DEATH:** **Craniocerebral Blunt Force Injuries**

Jason P. Tovar, M.D.
Chief Forensic Pathologist/
Pediatric Pathologist
July 4, 2017

JPT/clk
R: 05/12/17
T: 05/13/17

**WITNESSES:**
None.

**IDENTIFICATION:**
The body is identified by a Sacramento County Coroner's ID tag attached to the left great toe, labeled with the decedent's listed name and case number.

**EVIDENCE OF MEDICAL INTERVENTION:**
There is a hospital identification band around the left wrist and left great toe. A hospital ID band is around the right ankle. There are bilateral intravenous lines in the antecubital fossae. An endotracheal tube is held in place with a harness. An orogastric tube is in place. There is an intravenous line in the anterior right wrist. There is a sutured wound on the left hand between the index finger and thumb. There is a triple-lumen catheter in the right groin. A Foley catheter is in the urethra. There has not been organ procurement.

**CLOTHING:**
The decedent is clad in a hospital-type gown.

## EXTERNAL EXAMINATION

The body is that of an unembalmed, refrigerated, adult male who appears consistent with the reported age of 29 years. The body weighs 195 pounds, measures 70 inches in length, and is well built and well nourished. The skin is remarkable for blunt force injuries, as described below in "Evidence of Traumatic Injury". The skin is free of burns. No wrist scars are identified. Tattoos are present on the anterior torso, upper and lower extremities, and on the penis. Rigor mortis is present. Livor mortis is fixed posteriorly.

The head is normocephalic and traumatic, as described below in "Evidence of Traumatic Injury". The scalp is covered by brown hair. There is no balding and the hair can be described as short and curly. A goatee-type mustache and beard are present. Examination of the eyes reveals irides that are brown in color. There are no petechial hemorrhages. The oronasal passages are unobstructed. The teeth are natural and in good repair. The earlobes are unremarkable. There is no hemorrhage or discharge in the external auditory canals. The neck is unremarkable. There is no chest deformity. There is no increased anterior-posterior diameter. The abdomen is flat. The genitalia are those of an adult male. The penis is circumcised. The external genitalia are without trauma or lesions. The extremities show no edema, joint deformity, abnormal mobility, non-therapeutic punctures, or needle tracks. There is no cyanosis of the nail beds of the fingers.

**EVIDENCE OF TRAUMATIC INJURY:**
In the center of the forehead is a contusion measuring ½ inch. On the right side of the forehead above the eyebrow is a ¼ inch abrasion and on the left side of the forehead above the eyebrow is a 7/8 inch abrasion. There is a 1 ¾ inch abrasion on the right cheek just lateral to the corner of the eye. There is a 1 inch abrasion with contusion on the lateral left cheek at the corner of the eye and a 1 inch abrasion on the left cheek in the center. There is a 3/8 inch abrasion on the right nasal ala of the nose, and an abrasion on the left side of the upper lip measuring ¼ inch. There is submental abrasion measuring 2 ¼ x 7/8 inch.

On reflection of the scalp, there is subcutaneous and subgaleal hemorrhage of the bilateral parietal and occipital regions. There is hemorrhage along the posterior aspect of the sagittal suture, with mild diastasis. There is a fracture identified in the occipital bone just to the right of the midline, extending from the right lambdoid suture inferiorly into the base of the skull where there are radiating fractures laterally into the right and left posterior cranial fossa. There is epidural hemorrhage in the midline underlying the sagittal suture. Additionally, there is diffuse subarachnoid hemorrhage of the brain. There is extensive subdural hemorrhage of the base of the brain and focally over the dorsal convexities of the cerebral hemispheres. The brain is swollen and there are bilateral inferior frontal and temporal lobe contusions with disruption. There is evidence of herniation and contusion of the left uncus and Duret hemorrhages seen in the pons.

Further reflection of the back of the scalp and posterior neck reveals no hemorrhage of the lower cervical region of the neck; however, the upper cervical region has hemorrhage in the soft tissues of the neck and the posterior occipital scalp has an area of subcutaneous hemorrhage that measures 3 inches. This overlies the observed fracture of the occipital bone.

Over the left clavicle is a 5/8 inch abrasion. The upper right and left side of the back have abrasions measuring 2 ¾ x 2 ½ inches and ¾ inch, respectively. The lumbar back has a 1 ¼ inch abrasion. Reflection of the back skin reveals focal subcutaneous hemorrhage over the right shoulder region. Additionally, there is hemorrhage in the soft tissues of the lumbar back with hematoma formation across the entire lower back. Internally, there is focal contusion of the tail of the pancreas.

The medial right upper arm has an abrasion measuring 1/16 inch. At the medial antecubital fossa is an abrasion measuring 1/16 inch. The posteromedial surface of the right upper arm just above the right elbow is an area of abrasion measuring 3 ½ x 1 ¼ inches. The lateral surface of the posterior right upper arm has an abrasion measuring 1 3/8 inch. Surrounding the right elbow are abrasions ranging from 1/8 to ¾ inch. The right wrist shows contusion on the posterior surface and focally on the anterior medial and lateral surfaces. This measures 1 ¼ inch wide. The medial surface of the left arm shows a road rash type abrasion measuring 13 x 3 ½ inches. The lateral proximal left forearm shows a ½ inch abrasion. The left wrist has an abrasion measuring ¾ inch on the anterolateral surface. The posterolateral left wrist shows linear parallel abrasions measuring ¼ and 1 inch in length. The posterior left wrist shows red contusion. There is a sutured 2 ½ inch wound extending from the posterolateral surface left index finger anteriorly and proximally onto the palmer surface. The posterior metacarpophalngeal joint of the fifth finger has abrasion measuring 1 x ½ inch.

*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

The following observations are limited to findings other than injuries, if described above.

### INITIAL INCISION:
The body cavities are entered through the standard coronal incision and the standard Y-shaped incision. Additional incisions are made down the back to explore the soft tissues of the neck and back.

### CHEST/ABDOMINAL CAVITY:
Soft tissues of the thoracic and abdominal walls are well preserved. The subcutaneous fat of the abdominal wall measures 1 ½ inches. The pleural cavities are smooth and glistening. There is serous fluid in the pleural spaces: 25 cc on the right and 250 cc on the left. The organs of the abdominal cavity have a normal arrangement and none are absent. There is no fluid collection. The peritoneal cavity is without evidence of peritonitis. There are no adhesions.

### HEAD AND CENTRAL NERVOUS SYSTEM:
See "Evidence of Traumatic Injury". The brain weighs 1390 gm. No natural pathology is observed.

### SPINAL CORD:
The entire cord is not dissected.

### NECK:
The neck organs are removed en bloc with the tongue. No foreign material is present in the mouth, upper airway, or trachea. No lesions are present and there is no trauma of the gingiva, lips, or oral mucosa. There is no edema of the larynx. Both hyoid bone and larynx are intact and without fractures. No hemorrhage is present in the adjacent throat organs, investing fascia, strap muscles, thyroid, or visceral fascia. There are no prevertebral fascial hemorrhages. The tongue when sectioned shows no trauma.

**ENDOCRINE SYSTEM:**
The thyroid is red-tan in color. The parathyroid glands are not identified. The adrenals are unremarkable. The pituitary gland is unremarkable.

**MUSCULOSKELETAL SYSTEM:**
No abnormalities of the bony framework or muscles are present.

**SPECIAL SENSES:**
The eyes are not dissected. The middle and inner ear are not dissected.

**HISTOLOGIC SECTIONS:**
Representative sections from various organs are preserved in one storage jar in 10% formalin. No sections are submitted for histology.

**TOXICOLOGY:**
Bile, femoral blood, heart blood, liver tissue, stomach contents, urine from Foley reservoir, and vitreous humor have been obtained. Five vials of antemortem blood are received with the body.

**SPECIAL PROCEDURES:**
Blood is obtained for DNA.

**PHOTOGRAPHY:**
Photographs have been taken prior to and during the course of the autopsy.

**DIAGRAMS:**
Diagrams were used during the performance of the autopsy. The diagrams are not intended to be facsimiles and are not drawn to scale.

**RADIOLOGY:**
No x-rays are obtained.

**EVIDENCE:**
None.


JPT/clk
R: 05/12/17
T: 05/13/17



17-003400 (0001)

# Sacramento County
# District Attorney's Office

### ANNE MARIE SCHUBERT
District Attorney

Stephen J. Grippi
Chief Deputy

Michael A. Neves
Assistant District Attorney

Edward M. Pollock
Laboratory Director

May 30, 2017

Sacramento County Coroner
4800 Broadway, Suite 100
Sacramento, CA 95820

LAB NO: 17-003400
REQUEST NO: 0001
AGENCY NO: COR-17-002522

NAME: Ellis, Ryan

### Blood Alcohol Report

Submission: 001

Source: Ellis, Ryan

Sample Type: blood

Ethanol Result: None Detected

Date Received: 5/9/2017

Date Analyzed: 5/25/2017

Origin: antemortem

NOTE:
Name on tube: MSJMC, WHEAT0517
Date collected: 05/04/17
Time collected: 2106
Tube type: Purple top

_____
Kristine Myhre, Criminalist
Forensic Alcohol Analyst

May 25, 2017
_____
Date

_____   5/26/2017
Technical Reviewer             Date
Isaac Eaquinto, Criminalist

_____   5/30/2017
Administrative Reviewer        Date
Karen Buckman, Criminalist

LABORATORY OF FORENSIC SERVICES
4800 Broadway, Suite 200 - Sacramento, CA 95820
(916) 874-9240    FAX (916) 321-2230
www.sacda.org
This report contains the results and conclusions of the signing analyst.
Supporting examination documentation is maintained in the case file.




# Sacramento County
# District Attorney's Office

Stephen J. Grippi
Chief Deputy

Michael A. Neves
Assistant District Attorney

### ANNE MARIE SCHUBERT
District Attorney

Edward M. Pollock
Laboratory Director

May 17, 2017

Sacramento County Coroner
4800 Broadway, Suite 100
Sacramento, CA 95820

LAB NO: 17-003400
REQUEST NO: 0002
AGENCY NO: COR-17-002522

**NAME:** Ellis, Ryan

## Toxicology Report

Submission: 001

Source: Ellis, Ryan

Sample Type: blood

Date Received: 5/9/2017

Origin: antemortem

### Drug Classes Evaluated

amphetamine, benzodiazepines, benzoylecgonine (cocaine metabolite), carisoprodol, methadone, methamphetamine, opiates, oxycodone, zolpidem, tetrahydrocannabinols.

| Drugs Confirmed | Concentration | Estimated Uncertainty (99.7% confidence at k=3) | Analyst |
|---|---|---|---|
| methamphetamine | 272 ng/mL | ±46 ng/mL | Porter, Sara |
| amphetamine | 27 ng/mL | ± 5 ng/mL | Porter, Sara |

NOTE:
Name on tube: MSJMC, WHEAT0517
Date collected: 05/04/17
Time collected: 2106
Tube type: Purple top

*Sara Porter*

Sara Porter, Criminalist

May 16, 2017

Date

LABORATORY OF FORENSIC SERVICES
4800 Broadway, Suite 200 - Sacramento, CA 95820
(916) 874-9240   FAX (916) 321-2230
www.sacda.org
This report contains the results and conclusions of the signing analyst.
Supporting examination documentation is maintained in the case file.

Page 1 of 2

Sacramento County Coroner
Agency No:  COR-17-002522

Toxicology Report 17-003400 (0002) - Continued

_Matthew Nakayama_                    5/17/2017
_____
Technical Reviewer                  Date
Matthew Nakayama, Criminalist

_Karen J Buckman_                    5/17/2017
_____
Administrative Reviewer             Date
Karen Buckman, Criminalist

LABORATORY OF FORENSIC SERVICES
4800 Broadway, Suite 200 - Sacramento, CA  95820
(916) 874-9240    FAX (916) 321-2230
www.sacda.org
This report contains the results and conclusions of the signing analyst.
Supporting examination documentation is maintained in the case file.

Page 2 of 2

# Exhibit C

# 18 U.S. Code § 1510. Obstruction of criminal investigations

U.S. Code    Notes

**(a)** Whoever willfully endeavors by means of bribery to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator shall be fined under this title, or imprisoned not more than five years, or both.

**(b)**

**(1)** Whoever, being an officer of a financial institution, with the intent to obstruct a judicial proceeding, directly or indirectly notifies any other person about the existence or contents of a subpoena for records of that financial institution, or information that has been furnished in response to that subpoena, shall be fined under this title or imprisoned not more than 5 years, or both.

**(2)** Whoever, being an officer of a financial institution, directly or indirectly notifies—

**(A)** a customer of that financial institution whose records are sought by a subpoena for records; or

**(B)** any other person named in that subpoena;

about the existence or contents of that subpoena or information that has been furnished in response to that subpoena, shall be fined under this title or imprisoned not more than one year, or both.

**(3)** As used in this subsection—

director, partner, employee, agent, or attorney of or for a financial institution; and

(B) the term "subpoena for records" means a Federal grand jury subpoena or a Department of Justice subpoena (issued under section 3486 of title 18), for customer records that has been served relating to a violation of, or a conspiracy to violate—

(i) section 215, 656, 657, 1005, 1006, 1007, 1014, 1344, 1956, 1957, or chapter 53 of title 31; or

(ii) section 1341 or 1343 affecting a financial institution.

(c) As used in this section, the term "criminal investigator" means any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations of or prosecutions for violations of the criminal laws of the United States.

(d)

(1) Whoever—

(A) acting as, or being, an officer, director, agent or employee of a person engaged in the business of insurance whose activities affect interstate commerce, or

(B) is engaged in the business of insurance whose activities affect interstate commerce or is involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business,

with intent to obstruct a judicial proceeding, directly or indirectly notifies any other person about the existence or contents of a subpoena for records of that person engaged in such business or information that has been furnished to a Federal grand jury in response to that subpoena, shall be fined as provided by this title or imprisoned not more than 5 years, or both.

(2) As used in paragraph (1), the term "subpoena for records" means a Federal grand jury subpoena for records that has been served relating to a violation of, or a conspiracy to violate, section 1033 of this title.

(e) Whoever, having been notified of the applicable disclosure prohibitions or confidentiality requirements of section 2709(c)(1) of this title, section 626(d)(1) or 627(c)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681u(d)(1) or 1681v(c)(1)), section 1114(a)(3)(A) or 1114(a)(5)(D)(i) of the Right to Financial Privacy Act [1] (12 U.S.C. 3414(a)(3)(A) or 3414(a)(5)(D)(i)), or section 802(b)(1) of the National Security Act of 1947 (50 U.S.C. 436(b)(1)),[2] knowingly and with the intent to obstruct an investigation or judicial proceeding violates such prohibitions or requirements applicable by law to such person shall be imprisoned for not more than five years, fined under this title, or both.

(Added Pub. L. 90–123, § 1(a), Nov. 3, 1967, 81 Stat. 362; amended Pub. L. 97–291, § 4(e), Oct. 12, 1982, 96 Stat. 1253; Pub. L. 101–73, title IX, § 962(c), Aug. 9, 1989, 103 Stat. 502; Pub. L. 102–550, title XV, § 1528, Oct. 28, 1992, 106 Stat. 4065; Pub. L. 103–322, title XXXII, § 320604(c), title XXXIII, § 330016(1)(K), Sept. 13, 1994, 108 Stat. 2119, 2147; Pub. L. 104–191, title II, § 248(c), Aug. 21, 1996, 110 Stat. 2020; Pub. L. 109–177, title I, § 117, Mar. 9, 2006, 120 Stat. 217; Pub. L. 111–148, title X, § 10606(d)(1), Mar. 23, 2010, 124 Stat. 1008.)

## U.S. Code Toolbox

Law about... Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?